UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

ROBERT HOFFMAN,

        Plaintiff,

v.                                  Case No. 2:11-cv-317
                                  HON. ROBERT HOLMES BELL

TIMOTHY STALLMAN, et al.,

        Defendants.

_____/

**OPINION**

       Plaintiff Robert Hoffman, an inmate currently confined at the Bellamy Creek Correctional Facility, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against doctors Timothy Stallman, Unknown Neri[1], and Harriet A. Squier. Plaintiff alleges that in 1995, he was diagnosed with Dupuytren's Contracture disease in his hands and feet. His disease rapidly progressed, particularly in his left hand. Plaintiff contends that Defendant have failed to provide him with adequate medical treatment for his condition in violation of the Eighth Amendment.

       In 2010-2011, Defendant Stallman twice submitted surgical consult requests, which were denied by Defendant Squier. Plaintiff claims that Defendant Squier failed to provide an alternative treatment plan that provided Plaintiff relief from the contracture in his left hand, particularly his left ring finger. Plaintiff alleges that as a result of the denial of treatment, the contracture in his ring finger has progressed to more than a 110 degree angle. Plaintiff further claims

---

[1]Initially named in Plaintiff's complaint as "Doctor Nuri."

that all of the named Defendants refused to provide him proper medication to treat the pain and sleeplessness caused by his disease. In addition, Plaintiff claims that Defendant Neri failed to approve his request for athletic shoes in violated of his Eighth Amendment rights. Plaintiff is suing Defendants in their individual and official capacities and is seeking compensatory and punitive damages, as well as injunctive relief.

Presently before the Court is the Defendants' Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff has filed a response, Defendants have replied to this response, Plaintiff has filed a motion for order to file a "sur-reply," and Defendants have filed a motion to strike the motion for order (docket #32, #33, #34, and #36). The matter is now ready for decision. Because both sides have asked that the Court consider evidentiary materials beyond the pleadings, the standards applicable to summary judgment apply. *See* Fed. R. Civ. P. 12(b).

Initially, the court notes Plaintiff has filed a motion for order to file a "sur-reply" (docket #34), which seeks to amend his response to Defendants' motion for summary judgment to include new arguments and printouts of the wikipedia entry on Dupuytren's contracture. Defendants have moved to strike this motion (docket #36). As noted by Defendants, Plaintiff was granted an enlargement of time to file a response to their motion for summary judgment on April 18, 2012, and again on June 4, 2012 (docket #27 and #31). A review of Plaintiff's motion reveals that he seeks to include new arguments and documents in support of his opinion regarding proper treatment for his condition. The court will grant Plaintiff's motion (docket #34) and address the attachments to his motion as part of his response to the motion for summary judgment. In addition, the court will deny Defendants' motion to strike (docket #36).

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R.

2

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

       In their motion for summary judgment, Defendants assert that their treatment of Plaintiff did not violate the Eighth Amendment. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison

official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a

4

> physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

In support of the motion, Defendant Squier attests that Plaintiff has a condition called Dupuytren's Contracture, which is a slow developing hand deformity. Over the course of decades, Dupuytren's Contracture causes the formation of knots in the connective tissue under the skin of the palm, eventually developing into a thick cord that can pull one or more of the fingers into a bent or

flexed position toward the palm, typically the fourth and fifth fingers. The cause is unknown and the course of the condition is unpredictable, as contractures may worsen over time, or may remain stable and mild. The condition is not considered totally disabling when only the ring and pinky fingers are affected by a contracture because the essential operative digits are the index finger, the middle finger and the thumb for activities of daily living. Treatment options for Dupuytren's Contracture are limited and have a low success rate. (Docket #19-2, Defendants' Exhibit 1, ¶¶ 4-6.)

    Plaintiff has been suffering from Dupuytren's Contracture to the fourth and fifth fingers of his left hand, and to a lesser degree to his right hand, for a period of several years. (Docket #19-2, Defendants' Exhibit 1, ¶ 4.) On August 17, 2010, Defendant Squier reviewed a request for an orthopedic consultation from Defendant Stallman to evaluate Plaintiff for possible surgery. Defendant Stallman noted that Plaintiff had a 45 degree contracture on his left hand and a 30 degree contracture on his right hand. Defendant Stallman further indicated that Plaintiff was complaining that it was painful to grip items and that he had difficulty climbing or interlacing his fingers. Defendant Stallman further noted that Plaintiff had nodular densities in his feet and that he was reporting pain in his feet when ambulating. (Docket #19-2, Defendants' Exhibit 1, ¶ 7.) In response to the request for a consultation, Defendant Squier stated:

> According to Up to Date: "Patient can stretch the palms gently twice a day. Place the fingers on the edge of a table, palm down; then lift the palms upward gradually, keeping fingers flat to the table. Hold for 10 to 20 seconds, perform five repetitions twice daily."
>
> Other helpful interventions include avoiding a tight grip on handles and other objects. Sometimes injection with triamcinolone and lidocaine can be helpful for pain or rapidly growing nodules. This procedure may not work for longstanding scar tissue, however.
>
> Surgery in younger patients tends to have a poor prognosis, with a very high rate of recurrence. UP to Date suggests that if at all possible, surgery be delayed until after age 70.

6

(Docket #21, Defendants' Attachment #1 to Exhibit #1, p. 48 of 70.)

On January 31, 2011, Defendant Squier reviewed a consultation request from Michael Millette, P.A. to evaluate Plaintiff's hand contracture. According to the request, Plaintiff continued to suffer from a contracture of 60 degrees to his left hand and 30 degrees to his right hand, and it was noted that passive motion did not extend beyond the contracture with frequent stretching as previously recommended. Finally, the stretching had failed to improve Plaintiff's condition and that his activities of daily living (ADLs) were affected. (Docket #19-2, Defendants' Exhibit 1, ¶ 9, and Docket #21, Defendants' Attachment #1, p. 64 of 70.) On February 1, 2011, Defendant Squier determined that based on her knowledge and research concerning Dupuytren's contractures, surgical repair of Plaintiff's fingers was not a medical necessity. Defendant Squier recommended that Plaintiff's condition be managed conservatively. (Docket #19-2, Defendants' Exhibit 1, ¶ 9, and Docket #21, Defendants' Attachment #1, p. 65 of 70.)

On April 29, 2011, Defendant Squier received a consultation request from Defendant Stallman, which showed that the measure of contracture on Plaintiff's left hand was 45 degrees, which was actually better than the measure of Plaintiff's contracture on the left hand in January of 2011. Plaintiff's right hand contracture measured 30-45 degrees and nodular densities were noted in Plaintiff's feet. Defendant Squier again denied the consultation request, noting that steroid injections were generally ineffective for this condition and that surgery was risky and had a high recurrence rate in younger patients. Defendant Squier also noted that Plaintiff's ADLs did not appear to be significantly impaired. (Docket #19-2, Defendants' Exhibit 1, ¶ 10, and Docket #21, Defendants' Attachment #1, pp. 62-63 of 70.)

On November 18, 2011, Defendant Squier evaluated another request for an orthopedic consultation for Plaintiff by Defendant Neri. According to Defendant Neri, Plaintiff reported that the

7

contracture of the left ring finger had worsened and that the stretching exercises caused pain.  Plaintiff also complained that the nodule on his foot was causing pain when walking.  Defendant Squier noted that Plaintiff had gained 20 to 30 pounds over the past year and that his foot pain would improve if he lost weight.  Defendant Squier advised Plaintiff against repetitive activities and recommended against surgery.  (Docket #19-2, Defendants' Exhibit 1, ¶ 11, and Docket #21, Defendants' Attachment #1, pp. 60-61 of 70.)

Finally, Defendant Squier attests that her recommendations against surgery were each based on the fact that Plaintiff's condition only affected the ring and pinky fingers, rather than the index, thumb and middle fingers, and did not significantly interfere with Plaintiff's ADLs.  Defendant Squier noted that between January 1, 2010, and November 18, 2011, Plaintiff did not complain that he could not dress or feed himself, use the restroom, or express any other serious limitation.  Plaintiff has been prescribed various medications for his complaints of pain, which include Naprosyn, Motrin, and Elavil.  Plaintiff chose to discontinue the Elavil, claiming that it was ineffective.  Plaintiff was also approved for tennis shoes to address the nodules in his feet.  Defendant Squier further noted that surgical intervention is not recommended for Plaintiff's condition unless the risk of surgery is outweighed by the need of the patient to pursue career objectives.  Improvement following surgery may not be significant and there is a high likelihood of recurrence.  Plaintiff was instructed to make lifestyle adjustments to avoid exacerbation of his conditions, such as to avoid repetitive tasks, lose weight, and avoid smoking and alcohol consumption.  There is no evidence that Plaintiff is developing contractures in his other fingers.  (Docket #19-2, Defendants' Exhibit 1, ¶¶ 12-14, and Docket #21, Defendants' Attachment #1, pp. 11-12, 15, 33, 39, 51-52, 55-57, 60, and 64 of 70.)

In his affidavit, Defendant Stallman attests that he saw Plaintiff on July 12, 2010, and that Plaintiff complained that his Dupuytren's contractures were causing difficulty with gripping

8

items with his left hand, and stated that he could not climb safely or interlace his fingers.  Plaintiff also complained of pain in his feet when walking.  Defendant Stallman observed marked contractures to Plaintiff's left hand and nodular densities to his feet and recommended an orthopedic consultation and tennis shoes to alleviate Plaintiff's foot discomfort.  (Docket #19-2, Defendants' Exhibit 2, ¶ 6, and Docket #21, Defendants' Attachment #1, pp. 55-57 of 70.)

On July 24, 2010, Defendant Stallman saw Plaintiff for a follow-up appointment and noted the alternative treatment plan recommending a physical therapy evaluation.  On July 27, 2010, Plaintiff was given special accommodation orders for a bottom bunk, arch supports, heel cups, insoles, orthotic shoe inserts, and athletic shoes.  (Docket #19-2, Defendants' Exhibit 2, ¶¶ 7-8, and Docket #21, Defendants' Attachment #1, pp. 52 and 54 of 70.)  On August 11, 2010, Plaintiff was evaluated for physical therapy and it was determined that it would not be productive and that occupational therapy would be more appropriate for evaluating Plaintiff's condition.  (Docket #19-2, Defendants' Exhibit 2, ¶ 9, and Docket #21, Defendants' Attachment #1, p. 49 of 70.)

On August 23, 2010, Defendant Stallman saw Plaintiff to discuss stretching exercises, Plaintiff was not pleased.  From November 10, 2010, until January 1, 2011, Plaintiff was medically evaluated multiple times because he was on a hunger strike concerning a dispute regarding Plaintiff's segregation evaluation.  (Docket #19-2, Defendants' Exhibit 2, ¶¶ 11-12, and Docket #21, Defendants' Attachment #1, pp. 45-46 of 70.)  Plaintiff was seen by Defendant Neri on January 7, 2011, who noted no drastic change in Plaintiff's contractures.  (Docket #19-2, Defendants' Exhibit 2, ¶ 13, and Docket #21, Defendants' Attachment #1, pp. 40-41 of 70.)  On January 28, 2011, Plaintiff was seen by Theresa Merling, R.N., who noted Plaintiff's contractures and Plaintiff's medication history.  Plaintiff requested surgery and Nurse Merling submitted a request for an orthopedic

9

evaluation.  (Docket #19-2, Defendants' Exhibit 2, ¶ 15, and Docket #21, Defendants' Attachment #1, pp. 36-37, 64-65 of 70.)

On February 8, 2011, Plaintiff was seen by Physician's Assistant Michael Millette regarding Plaintiff's high blood pressure and hand stretching exercises.  On March 4, 2011, Plaintiff was seen by Defendant Neri regarding his high blood pressure.  On April 20, 2011, Plaintiff was seen by Joseph Damron, R.N., who noted that Plaintiff ambulated with a steady gait.  Mr. Damron recommended ibuprofen for pain and provided patient education regarding Plaintiff's condition.  (Docket #19-2, Defendants' Exhibit 2, ¶¶ 16-18, and Docket #21, Defendants' Attachment #1, pp. 30-34 of 70.)  On April 27, 2011, Defendant Stallman saw Plaintiff, who complained of increasing pain in his contractures.  Defendant Stallman requested an orthopedic consultation.  On April 29, 2011, Defendant Squier recommended that Plaintiff not receive surgery as it was not a medical necessity and could be counter-effective.  (Docket #19-2, Defendants' Exhibit 2, ¶¶ 19-20, and Docket #21, Defendants' Attachment #1, pp. 40-41 of 70.)

Defendant Stallman states that the appropriateness of surgery for Plaintiff is debatable because there is no cure for his disease, the surgery is risky and in 50% of the cases it produces no improvement, and Plaintiff is able to perform the activities of daily living, such as dressing and feeding himself.  Defendant Stallman attests that Plaintiff's complaints of pain were unusual for his condition and that they were adequately addressed by Naprosyn and other NSAIDs.  Defendant Stallman considers submitting a consultation request to be the same thing as requesting a second opinion, which is good practice and standard procedure where a patient's subjective complaints are inconsistent with objective observations.  Defendant Stallman was not surprised by Defendant Squier's denial, as it was based on her review of current medical recommendations and is consistent with protocol.  (Docket #19-2, Defendants' Exhibit 2, ¶¶ 21-23.)

10

Defendant Neri's affidavit is consistent with the affidavits of Defendants Squier and Stallman, as well as with the medical record.  Defendant Neri attests that he first saw Plaintiff on January 7, 2011, and noted that Plaintiff was able to manage activities of daily living and that there had been no drastic change in Plaintiff's contractures from the time of Plaintiff's prior assessment. Defendant Neri noted that an orthopedic consultation had been denied five to six months earlier and that Plaintiff had been prescribed Elavil for pain.  Plaintiff stopped taking the Elavil for one week, so the medication was cancelled.  (Docket #19-2, Defendants' Exhibit 3, ¶ 6, and Docket #21, Defendants' Attachment #1, pp. 38-42, 47-50, 56-59, and 68-70 of 70.)  Because there was no change in Plaintiff's condition, Defendant Neri did not request an orthopedic consultation.  (Docket #19-2, Defendants' Exhibit 3, ¶ 7.)

Defendant Neri saw Plaintiff on August 31, 2011, and noted that Plaintiff was doing stretching exercises, but stated that they were not helping and that his pain was getting worse. Plaintiff was prescribed Naprosyn for pain.  On October 26, 2011, Plaintiff told Gerald Covert, R.N., that the Naprosyn was not effective.  On November 7, 2011, Plaintiff requested a refill of the Naprosyn, but declined a full assessment.  On November 16, 2011, Defendant Neri examined Plaintiff and recommended an orthopedic consultation in order to determine if any additional treatment was available for Plaintiff's condition.  Defendant Neri prescribed Motrin for pain.  (Docket #19-2, Defendants' Exhibit 3, ¶¶ 9-13, and Docket #21, Defendants' Attachment #1, pp. 7-11, 12, 15-17 of 70.)

Defendant Neri states that he believes that the appropriateness of surgery for Plaintiff is debatable because there is no cure for his disease, the surgery is risky and in 50% of the cases it produces no improvement, and Plaintiff is able to perform the activities of daily living, such as dressing and feeding himself.  Defendant Neri attests that Plaintiff's complaints of pain were unusual

11

for his condition and that they were adequately addressed by Naprosyn and other NSAIDs.  Defendant Neri considers submitting a consultation request to be the same thing as requesting a second opinion, which is good practice and standard procedure where a patient's subjective complaints are inconsistent with objective observations.  Defendant Neri does not disagree with Defendant Squier's denial of an orthopedic consultation, as it was based on her review of current medical recommendations and is consistent with protocol.  (Docket #19-2, Defendants' Exhibit 3, ¶¶ 15-17.)

In response to Defendants' motion for summary judgment, Plaintiff offers a printout of the wikipedia entry for Dupuytren's contracture, which states that Radiation therapy is a viable treatment for the early stages of Dupuytren's contracture and that after a mean follow-up of thirteen years, radiotherapy is effective in prevention of disease progression.  (Docket #34-1, p. 4 of 9.)

A careful review of the record in this case shows that Plaintiff was evaluated on numerous occasions and that he was provided with the treatment deemed to be appropriate by medical professionals.  The fact that there might be some treatment available that Plaintiff has not been offered does not compel a finding that Defendants were deliberately indifferent to Plaintiff's condition.  As noted above, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer*, 62 F.3d at 154-55; *Ward v. Smith*, 1996 WL 627724 at *1).  Therefore, the court concludes that Plaintiff's claims against Defendants Squier, Stallman and Neri do not rise to the level of an Eighth Amendment claim. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

In light of the foregoing, the court concludes that Plaintiff has failed to sustain his burden of proof in response to Defendants' motion for summary judgment.  Accordingly, Defendants'

12

Motion for Summary Judgment (Docket #19) will be **GRANTED** and this case will be dismissed in its entirety.

        The court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the court grants Defendants' motion for summary judgment, the court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If Plaintiff is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

        An Order and Judgment consistent with this Opinion will be entered.


Dated: <u>February 20, 2013</u>                    /s/ Robert Holmes Bell
                                           ROBERT HOLMES BELL
                                           UNITED STATES DISTRICT JUDGE